STATE ex rel. HUNZICKER v. PULLIAM.

No. 24879. June 19, 1934.

Rehearing Denied Sept. 11, 1934.

Keaton, Wells, Johnston & Barnes and Walter Marlin, for plaintiff.

Harlan T. Deupree, Municipal Counselor, Ledbetter, Stuart, Bell & Ledbetter, Floyd C. Dooley, Stanley B. Catlett, and Everest, McKenzie, Halley & Gibbens, for defendant.

SWINDALL, J. On July 25, 1933, the plaintiff filed in this court an original proceeding for writ of mandamus to compel the defendant, as acting city clerk of Oklahoma City, state of Oklahoma, to act upon referendum petition No. 5, presented by the alleged requisite number of qualified electors of Oklahoma City, Okla., praying for the submission of Ordinance No. 4475 of Oklahoma City, Okla., in the manner required by law, and determine the sufficiency thereof, and in the event defendant find the same sufficient, immediately notify the chief executive officer of Oklahoma City of such finding in order that he may call an election and submit to the qualified electors of the city of Oklahoma City said Ordinance No. 4475, for adoption or rejection. The court took jurisdiction and issued an alternative writ. On July 10, 1933, the plaintiff filed an amendment to his petition, and on August 9, 1933, defendant filed his return to the alternative writ of mandamus. The petition and amendment thereto, and return to the writ, show that on the 23rd day of May, 1933, there was introduced and

read in open meeting of the council of the city of Oklahoma City Ordinance No. 4475, entitled:

"An ordinance extending the limits of the U-7 or oil and gas district by adding subdivision 'O' to section 3 of Ordinance No. 3943 providing for certain limitations and regulations therein as to nondrilling territory and participation therein; providing that invalidity of parts shall not affect validity of remainder; and declaring an emergency."

On June 9, 1933, the ordinance was voted upon by the city council and failed to secure the necessary vote to attach the emergency clause, and was passed by eliminating the clause in the title "declaring an emergency", and eliminating the fourth section thereof, same being the emergency section, and in this form said ordinance was passed by a majority of the council and signed by the mayor of Oklahoma City and published in the Daily Record of June 9, 10, and 12, 1933. On June 12, 1933, certain citizens and legal voters of Oklahoma City filed their objection to said ordinance and notified the mayor in writing that they would circulate and file a proper referendum petition demanding that an election be held in Oklahoma City, wherein and whereat there should be referred to the legal voters of said city of Oklahoma City the question of whether or not a certain ordinance passed by the common council of Oklahoma City and approved by the mayor on the 9th day of June, 1933, then describing in said notice the ordinance by number and title. On June 13, 1933, at a meeting of the common council of Oklahoma City, Mr. Scott, one of the members of the council, dictated into the record of its proceedings of that date a statement to the effect that when he voted against the emergency section of the ordinance he was under the impression that an election could be held in the near future; that since he voted his attention had been called to the provisions of the city charter and the Constitution of the state which provide that when a petition demands a referendum vote on any ordinance or any other act, other than granting extension or renewal of a franchise, the chief executive officer shall submit the ordinance or act to the qualified electors of the municipal corporation at the next succeeding general municipal election, and if at said election the majority of the electors voting thereon shall not vote for the same, it shall thereupon stand repealed; that under his interpretation of these provisions a vote could not be taken on said

proposition until April, 1935, and the presentation of such initiative petition would have an effect of delay; that by the time an election could be held the oil would be drained from under the city property to such an extent that it would have no lease value; that he was in favor of the extension and felt that the city was entitled to the revenue, both bonus and royalty, from the wells that could be drilled on its property; that he was of the opinion that if such delay be permitted, the city would lose many thousands of dollars on account of the drainage of set-off wells; and that he was not willing that the city be deprived of this revenue. He thereupon moved to reconsider the vote on the emergency clause of said ordinance. The motion was seconded by Mr. Jacoby, a member of the council. Roll was called upon the motion to reconsider the emergency clause, and said motion to reconsider was adopted by roll call vote of six votes for the adoption and two votes against it. Thereupon it was moved by Mr. Estabrook, a member of the council, and seconded by Mr. Donart, another member, that the emergency clause be added to the Ordinance No. 4475, an ordinance providing for the extension of the U-7 or oil and gas drilling zone. The motion was read and adopted by a roll call vote of six votes for and two votes against the adoption thereof. On June 15, 1933, a copy of the Referendum Petition No. 5, City of Question No. ——, demanding submission of said Ordinance No. 4475 to the legal voters, was filed with the city clerk. On July 10, 1933, the petitioner filed an amendment to his petition for writ of mandamus in which he sets forth the time, place, and manner of filing the referendum petitions as follows:

"That, on July 10, 1933, Walter Marlin, O. J. Logan and one ——————— took Referendum Petition No. 5, containing 10,995 valid signatures, to the city hall in Oklahoma City, Okla., at about 1:30 o'clock p. m. and during office hours of said day; that said Walter Marlin requested Mike Peshek, whom he recognized as city clerk, to meet him in the mayor's office, in the City Hall, for the purpose of presenting, serving and filing said referendum petition; that said Mike Peshek thereupon suggested that James Pulliam, deputy clerk, go with said Walter Marlin et al. to the mayor's office for that purpose; that said Mike Peshek was thereupon advised that if he was the city clerk, he himself should go and be present when said petition was so presented, served, and filed; that said Mike Peshek did go to the second floor of the City Hall, on which the mayor's office is located, and

in the hallway on said floor stated that he would be in the mayor's office presently; that said Walter Marlin and other parties thereupon entered the mayor's office and inquired for the mayor, C. J. Blinn, and his secretary, Elizabeth Reeves, advised them that the mayor was in Oklahoma City, but was out of the office and would be out the entire afternoon, and, so far as she knew, could not be reached; that, notwithstanding this information, said Walter Marlin and the others accompanying him waited in the mayor's office for about two hours and until Walter Marlin was invited by the municipal counselor, Harlan Deupree, to a conference in an adjoining room, at which conference there were present said Harlan Deupree, Mike Peshek, and Walter Marlin; that Harlan Deupree asked Walter Marlin if he would not have James Pulliam appear in the mayor's office for the purpose of the filing of said referendum petition, as Mike Peshek was not certain of his official status; that as a result of this conference James Pulliam met Walter Marlin, O. J. Logan et al. in the mayor's office, where said petition was delivered to and deposited with James Pulliam as deputy city clerk; that Elizabeth Reeves, secretary to the mayor, stated that she had accepted service in civil cases for the mayor, and thereupon signed a written statement acknowledging receipt of said referendum petition; * * * that immediately thereafter James Pulliam, deputy city clerk, gave a receipt for said petition; * * * that thereafter and on July 11, 1933, said Walter Marlin again went to the city hall in Oklahoma City where, in the office of the mayor and in his presence and in the presence of J. J. Pulliam, he being the same person as James J. Pulliam, refiled said referendum petition, at which time said J. J. Pulliam, as acting city clerk, gave a receipt. * * *

"Plaintiff further states that every effort was made by said Walter Marlin on said 10th day of July, 1933, to serve and file said petition in the office and presence of the mayor of Oklahoma City, but that the latter could not be located and, as hereinbefore stated, the parties presenting said petition were advised by his said secretary that, while the mayor was in Oklahoma City, he would not be back at his office again that day and could not be reached."

The omissions in the amendment as set out above refer to the exhibits attached thereto, and they will be referred to later in this opinion.

The plaintiff contends: (1) That the ordinance in question having been passed and signed by the mayor on June 9, 1933, and attested by the city clerk, and published on that date and on the 10th and 12th days of June, 1933, the council was without power and authority to add the emergency clause to the said ordinance, as it had passed from under the control of the council as a legislative body; (2) that said ordinance wholly fails to state sufficient facts to constitute a legal emergency under the provisions of section 20, art. 2, and section 5, art. 5, of the Oklahoma City charter; (3) that if the emergency was in fact attached to the ordinance, then under the provisions in section 23 of article 2, upon referendum petitions being filed within the time provided in the charter that the same suspend the operation of the ordinance until the qualified electors vote upon the referendum question; (4) that the last day for filing referendum petitions under the provisions of the city charter fell on a Sunday, and that therefore the filing of same on the Monday following was within time.

The defendants contend: (1) That the emergency was properly added to the ordinance and that said ordinance could not be legally referred; (2) that in the event the court should hold the emergency was not legally attached to the ordinance, then the referendum petitions were not filed within the time provided by law; (3) that the referendum petitions were never filed in the office and with the officer required by law; (4) that the ordinance in its nature is administrative and not legislative, and that therefore the qualified electors of the city are not granted the right to vote upon that class of ordinances under the referendum provisions in the Constitution and legislative enactments of the state and the charter of Oklahoma City.

On September 18, 1933, the defendant filed a motion to dismiss petition and to quash alternative writ for the reason the defendant vacated the office of city clerk on or about the 31st day of August, 1933, and his successor, M. Peshek, Jr., was appointed and qualified as such city clerk and has been acting in said capacity since said date, and, therefore, the cause of action, if any, has become moot. Defendant cites in support of his motion Crigler, City Clerk, v. Nichols, 51 Okla. 707, 152 P. 343; State ex rel. DeAtley v. Alexander, Clerk, 77 Okla. 87, 186 P. 1080; and Carlton, City Clerk, v. Boardman Co., 115 Okla. 151, 241 P. 151. We do not think this motion is well taken. Section 1, chapter 88, S. L. 1923, now section 572, O. S. 1931, provides that:

"Any person being an elected or appointed public official shall, after the passage of this act, become amenable, in the

same manner and to the same extent, to any mandamus, quo warranto, injunction or other extraordinary court order, as though originally obtained against him; and a revivor of such action in which such order was obtained, is hereby declared to exist against any person in his official capacity to the extent that any mandamus, quo warranto, injunction or other extraordinary court order granted or obtained against his predecessor, in his official capacity, shall be as binding on, and he shall be as amenable to, as though originally obtained against him."

This act was passed by the Legislature after the first two cited cases were decided by this court, and was evidently not called to the attention of the court in the Carlton Case. So, it having been made to appear to the court that the personnel in the office of the city clerk of Oklahoma City, Okla., has changed since the commencement of this action, the same will be, and is hereby ordered revived in the name of M. Peshek, Jr., successor in office to James Pulliam, and the motion to dismiss is denied.

The plaintiff has filed his motion to strike from the files purported supplemental response to alternative writ. It is based principally upon the ground that the same was filed without leave of court. This is an original proceeding in this court, and in furtherance of justice the motion to strike will be denied and the supplemental response will be considered in the determination of this action.

This brings us to a consideration of the issues presented in the briefs of the respective parties on the merits. We will first consider the proposition relating to the sufficiency of the filing of the initiative petition and the signatures in the office of the mayor of Oklahoma City with his secretary in the absence of the mayor from his office. The defendant does not contend that the allegations in the amendment to the petition of plaintiff relative to the efforts of the plaintiff to file the initiative petition with the mayor personally are not true, but alleges that C. J. Blinn, the mayor of the city of Oklahoma City, was, on the 10th day of July, 1933, in his office as a practicing attorney in the city of Oklahoma City, where his office had been maintained for a period of some 15 or 20 years, and that the said mayor had remained in the city because of the fact that he had been advised that parties might attempt to file or deliver some kind of paper or papers having to do with Ordinance No. 4475, and that

he had made himself available for that purpose if he was wanted. His law office is not in the city building where the office of mayor is maintained, and the initiative petition and signatures were presented at the proper place and filed with the secretary to the mayor at the office of the mayor in the city building. Exhibit A, attached to amendment to petition reads:

"The City of Oklahoma City,
  "Oklahoma City, Oklahoma
                                    "July 10, 1933.
            "Office of Mayor
  "Received from O. J. Logan, Six (6) Books of Petitions for Referendum of City Ordinance No. 4475, said books purporting to contain 587 petitions, and purporting to show a total of 10,995 signatures.
            "(Signed) Elizabeth Reeves,
                "Secretary to the Mayor.
            "(Signed) James J. Pulliam,
                "Deputy Clerk."

Exhibit B to the amendment to the petition describes the six books of petitions for referendum of said ordinance by giving number of petitions in each book and number of signatures in each book. The total number of books and purported signatures being the same as in the joint receipt of the secretary to the mayor and the deputy city clerk and is signed by the deputy clerk only.

Under section 5888, O. S. 1931, the signatures to each referendum petition against any ordinance or resolution passed by a municipal legislative body shall be verified in the manner provided in section 5872, O. S. 1931, section 4, S. L. 1907-08. The petition shall be filed with the chief executive officer of the city within 30 days after the passage of such ordinance or resolution. Under section 5890, only the measure proposed is required to be filed with the chief clerk of the city.

In the case of Edwards v. Grand et ux. (Cal.) 53 P. 796, that court in the 2nd and 4th syllabus paragraphs held:

2. "An instrument is 'filed' for record when it is deposited in the proper office with a person in charge thereof, with directions to record it, although not within the time that the recorder's office is required by statute to be kept open."

4. "Delivery of an instrument required to be filed to the proper officer at a place other than the office where it is to be filed is not sufficient, although the officer indorse it as properly filed."

In the case of Buchanan v. Commercial

Investment Trust (Ark.) 7 S. W. (2d) 318, it is held in part that:

"The act of leaving or depositing the paper in a proper office constitutes a filing of it within a statute providing therefor; the file mark being merely evidence of filing and not essential element."

In the case of Piersol v. State ex rel. Petree, Co. Atty., 122 Okla. 124, 254 P. 104, this court quoted with approval from 2 Words & Phrases (2d Series) 531, as follows:

" 'There can be no 'filing' of a paper in a legal sense except by its delivery to an official whose duty it is to file papers and who is required to keep and maintain an office or other public place for their deposit, and the paper must either be delivered personally to such officer with the intent that the same shall be filed by him, or delivered at the place where the same should be filed.' "

See, also, Ritter v. U. S., 28 F. (2d) 265; In re Lance, 106 N. Y. S. 211; State v. Cardy (Mo.) 185 S. W. 184; Hooge v. City of Milnor (N. D.) 217 N. W. 163. So, we hold, under the circumstances here, that the filing of the initiative petition with the secretary to the mayor in the office of the mayor was in substantial compliance with section 6648, C. O. S. 1921, requiring that, "The petition shall be filed with the chief executive officer within 30 days after the passage of such ordinance or resolution."

The question we shall now determine is, Was the filing of the petition on July 10th within time? The last day for filing such referendum petitions under the provisions of the city charter fell on Sunday, and the same were filed on the Monday following. Section 22 of article 1, O. S. 1931, provides that:

"The time within which an act is to be done, shall be computed by excluding the first day, and including the last; if the last day be Sunday, it shall be excluded."

The defendant contends that this section, being in the Code of Civil Procedure, applies only to acts to be done under the Practice Act, and cites in support of his contention the case of City of Denver v. Londoner, 33 Colo. 104, 80 P. 117. However, an examination of the authorities shows that the great majority of the courts in states having the same or a similar statute hold to a contrary view. In the case of English v. Williamson (Kan.) 8 P. 214, the Supreme Court of that state, in the 3rd syllabus paragraph, held that:

"And further held, in such case, that as September 4, 1881, was Sunday, the owner of the land had the right to redeem his land from the taxes up to and including September 5, 1881; that, in cases like this, where the last day comes on Sunday, it should be excluded in the computation of time, and the next day should be included."

In the body of the opinion the court uses this language:

"Under the statutes above quoted (Civil Code, sec. 722), when the last day comes on Sunday, that day, as well as the first, shall be excluded; and we suppose our tax laws, as well as all other statutes, were enacted with reference to this rule, and therefore that the rule should govern. Besides, we would also think that such rule should govern upon general principles."

That case was followed in Hicks v. Nelson, 45 Kan. 47, 32 Am. St. Rep. 709. In the case of Spencer v. Haug, 45 Minn. 231, 47 N. W. 794, the Supreme Court of that state held that:

"Section 82, c. 66, Gen. St., relating to the computation of time, was intended to establish a uniform rule, applicable to the construction of statutes as well as to matters of practice."

In the body of the opinion, at page 232, the court quotes the statute of that state as follows:

"The time within which an act is to be done, shall be computed by excluding the first day, and including the last. If the last day is Sunday, it shall be excluded."

That section of the statute of Minnesota is the same as section 22, chapter 1, O. S. 1931. In the case of Post v. Garrow et al., 18 Neb. 682, the Supreme Court of that state held that:

"When the day of performance of contracts other than instruments upon which days of grace are allowed, falls on Sunday, that day is not counted, and compliance with the stipulations of the contract on the next day (Monday) is deemed in law a performance."

See, also, Kipp v. Fitch, 73 Minn. 65; Backer v. Pyne, 130 Ind. 288, 30 Am. St. R. 231. Section 1, clause 11, chapter 131, R. L. of Illinois, 1874, provides that:

"The time within which any act provided by law is to be done shall be computed by excluding the first day and including the last, unless the last day is Sunday, and then it also shall be excluded."

In the case of Gage v. Davis, 129 Ill. 236, 16 Am. St. R. 260, the Supreme Court of that state held that:

"If the day of the month on which the right to redeem from a tax sale falls on a Sunday, it should not be computed, and the owner should be allowed all of the following Monday in which to redeem."

In the case of Johnston v. New Omaha, etc., Electric Light Co., 86 Neb. 165, 125 N. W. 153, 20 Ann. Cas. 1314, the Supreme Court of Nebraska held that:

"Said section 895 of the Code applies to the computation of time, whether the time to be taken into account is days, months, or years; and where an act is to be done, or is permitted to be done, within a specified time, and the last day is Sunday, it shall be excluded, and the act may be done on the following day."

See, also, cases cited in footnote to State v. Michel, 78 Am. St. R. 377, and Simmons v. Hand, 7 Ann. Cas. 326. In the case of Street v. U. S., 33 L. Ed., 631, the Supreme Court of the United States, in an opinion by Mr. Justice Brewer, held that where the Congress had not spoken upon the subject, where the last day within which to perform an act fell on Sunday, that Sunday should be excluded, the court using this language:

"Again, it must be noticed that the first day of January was Sunday, that is, a dies non, and a power that may be exercised up to and including a given day of the month may generally, when that day happens to be Sunday, be exercised on the succeeding day. So that it is a matter worthy at least of consideration whether the power was not exercised within the very limits of time prescribed by the Act."

In the case of Pressed Steel Car Co. v. Eastern Ry. Co. of Minnesota, 121 Fed. 609, the Circuit Court of Appeals, 8th Circuit, in an opinion delivered by Sanborn, Circuit Judge, at page 619, held that:

"When the last day within which a deed is to be performed falls on Sunday, that day is excluded, and the act may be done on the succeeding day."

—and cited with approval Street v. U. S., supra, Spencer v. Haug, supra, and Post v. Garrow, supra. The case of Street v. U. S., supra, was followed by the Court of Appeals of the District of Columbia in the case of Lamson v. Andrews, 40 App. Cas. 39. Therefore, we are forced to the conclusion that under the great weight of authority the last day within which to file the initiative petition falling on a Sunday, the same was properly filed on the Monday following.

We will next consider the proposition contended for by plaintiff that the ordinance in question having been passed and signed by the mayor on the 9th day of June, 1933, and attested by the city clerk and published on that date, and on the 10th and 12th days of June, 1933, the council was without power and authority to add the emergency clause to the said ordinance, as it had passed from under the control of the council as a legislative body. Section 5889, O. S. 1931, provides that:

"No ordinance or resolution of a municipal Legislature shall become operative until 30 days after its passage and approval by the executive officer, unless the same shall be passed over his veto, and in that case it shall not take effect and become operative until 30 days after such final passage except measures necessary for the immediate preservation of peace, health, or safety; and no such emergency measure shall become immediately operative, unless it shall state, in a separate section, the reasons why it is necessary that it should become immediately operative, and the question of emergency shall be ruled upon separately and be approved by the affirmative vote of three-fourths of all the members elected to the city council taken by the ayes and noes, and the whole measure be approved by the executive officers."

Section 24 of article 2 of the charter of Oklahoma City provides that:

"No ordinance or section thereof shall be amended or repealed except by ordinance adopted in the manner provided in this charter."

Section 20 of article 2 of the charter reads in part as follows:

"No ordinance shall be passed finally on the date when it is introduced, except in case of public emergency, the nature of which emergency shall be clearly stated in such ordinances."

The second paragraph of section 5, article 5 ,of said charter reads in part as follows:

"Every emergency ordinance must, after the title, contain the words 'emergency ordinance,' as a part of the caption, and every such ordinance shall, in a separate section, briefly state the facts or the cause affecting the public peace, health or public safety and demanding the passage of the emergency ordinance."

In the case of State ex rel. Whitney v. Van Buskirk, 40 N. J. L. 463, the Supreme Court of that state, in the 3rd syllabus paragraph, held that:

"A deliberative body has the right to vote and reconsider its vote upon measures be-

fore it, at its own pleasure, until, by a final vote, accepted as such by itself, a conclusion is reached. Such final action is shown by its adjournment thereon, the public promulgation of its action, or by subsequent proceedings inconsistent with a purpose to review."

In the case of Ashton v. City of Rochester, 14 N. Y. S. 855, the New York court, in the 2nd syllabus paragraph, held that:

"An ordinance, after it has been passed over the mayor's veto, cannot be reconsidered by the city council."

In the case of People ex rel. Lanphier et al. v. Hatch, Secretary of State, 19 Ill. 283, the Supreme Court of Illinois held that:

"If the Governor shall deposit an act of the General Assembly, approved by him, with the Secretary of State, it is then beyond his further action, although his approval was put to the act by mistake."

In the very recent case of U. S. v. Smith, 76 L. Ed. 955, the Supreme Court of the United States had under consideration a resolution passed by the Senate consenting to the nomination of Smith to be a member of the Federal Power Commission. On December 20, 1930, the Senate in open executive session by a vote of 38 to 22, with 35 Senators not voting, advised and consented to the appointment of Smith to the office for which he had been nominated. On the same day the Senate ordered that the resolution of confirmation be forwarded to the President. This order was entered late in the afternoon of Saturday, December 20, 1930, and still later on the same day the Senate adjourned to January 5, 1931. On Monday, December 22, 1930, the Secretary of the Senate notified the President of the United States of the resolution of confirmation, the communication being delivered by the official messenger of the Senate. Subsequently, and on the same day, the President signed, and, through the Department of State, delivered to Smith a commission purporting to appoint him a member of the Federal Power Commission and designating him as chairman thereof. Smith then, on the same day, took the oath of office and undertook forthwith to discharge the duties of a commissioner. On January 5, 1931, which was the next day of actual executive session of the Senate after the date of confirmation, a motion to reconsider the nomination of Smith was duly made by a Senator who had voted to confirm it, and also a motion to request the President to return the resolution of confirmation which

had passed into his possession. Both motions were adopted and the President was notified in due course. On January 10, 1931, the President informed the Senate by a message in writing that he had theretofore appointed Smith to the office in question after receiving formal notice of confirmation, and that for this reason he refused to accede to the Senate's request. Thereafter, a motion was made and adopted by the Senate directing the executive clerk to place on the executive calendar the "name and nomination of said George Otis Smith." Subsequently, on February 4, 1931, the President pro tempore of the Senate put to the Senate the question of advice and consent to the appointment of Smith, and a majority of the Senators voted in the negative. Notification of this action was sent to the President. On the following day, February 5, 1931, the Senate by resolution requested the district attorney of the District of Columbia to institute in its Supreme Court proceedings in quo warranto to test Smith's right to hold office. The request of the Senate was complied with. Upon consideration of the case on the above state of facts by the Supreme Court of the United States, that court held that the nomination had passed beyond the control of the Senate, and sustained the appointment as valid. In the case of Smith v. Mitchell, 69 W. Va. 481, 72 S. E. 755, the Supreme Court of Appeals of that state, in the 2nd syllabus paragraph, held that:

"After a bill has been passed by the House of Delegates and reported to the Senate, and it has passed the Senate and been by its order sent to the House with report of its passage by the Senate, and the House refuses to return it to the Senate, the Senate cannot reconsider the vote passing the bill, as it has no possession or control over the bill, and its vote to reconsider will not impair the validity of the act."

In the body of the opinion it is said:

"A fundamental principle of that law is that, to enable a legislative body to reconsider a vote passing a bill, it must have control and possession of it. If it has performed its office upon the bill, and it has gone from its physical possession and control, it cannot reconsider."

And further:

"Very clear it is that when a bill has passed both branches of the Legislature, and been approved by the Governor and filed with the Secretary of State, the bill cannot be later reconsidered or recalled by either or both branches, simply because the

Constitution says that when so appoved it is law."

In the case of City of Coalgate et al. v. Gentilini, 51 Okla. 552, 152 P. 95, this court, in the 1st syllabus paragraph, held that:

"Section 3390, Rev. Laws 1910, provides that a city ordinance does not become operative until 30 days after its passage and approval. Held, that this does not render the ordinance void; and it cannot be treated as not in existence during that time, but, while it is inoperative, yet the effect and purpose of the ordinance is, from and after the date of its passage and approval, to take control of the subject of the ordinance."

In that case the ordinance had not been passed by the council and approved by the mayor, filed with the city clerk, and published. Our attention has not been called to a decision and we have been unable to find one holding that after an ordinance has been duly passed by a city council, approved by the mayor and filed with the city clerk, and published, the same may be reconsidered and an emergency section or other sections added to the bill. If such were the law, then no ordinance would ever pass from the control of the legislative body. So, upon this issue, we hold that when the ordinance involved in this action was passed by a majority of the council without the emergency being attached, and was approved by the mayor and filed with the city clerk and published as required by the city charter, the same passed beyond the control of the council and it had no power or authority to amend that ordinance by attaching the emergency thereto without re-enacting the ordinance in its entirety with the emergency as a new ordinance.

The defendant contends that the ordinance in its nature is administrative and not legislative, and that, therefore, the qualified electors of the city are not granted the right to vote upon that class of ordinances under the referendum provisions in the Constitution and legislative enactments of the state and the charter of Oklahoma City. We do not think that contention tenable. A careful examination of chapter 178, S. L. 1923, shows clearly that the same is in its nature an act by the Legislature granting certain police power to municipal corporations. Section 1 is as follows:

"For the purpose of promoting health, safety, morals, or the general welfare of the community, the legislative body of cities and incorporated villages is hereby empowered to regulate and restrict the height, number of stories, and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts and other open spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes."

Section 2 provides that the local legislative body may divide the municipality into districts of such number, shape, and area as may be deemed best suited to carry out the purposes of said act; and section 3 provides that such regulations shall be made in accordance with a comprehensive plan and design to lessen congestion in the streets, to secure safety from fire, panic and other dangers, to promote health and the general welfare, to provide adequate light and air, to prevent the overcrowding of land, to avoid undue concentration of population; to facilitate the adequate provisions of transportation, water, sewage, schools, parks, and other public requirements; and further provides that such regulations shall be made with reasonable consideration, among other things, as to the character of the district, and its peculiar suitability for particular uses, with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality. California has a similar statute, and the Supreme Court of that state, in the case of Dwyer v. City Council of Berkeley, 253 P. 932, in the 1st, 2nd, 3rd, and 4th syllabus paragraphs held:

1. "Only municipal ordinances which involve an exercise of the legislative prerogative are subject to the initiative and referendum."

2. "Zoning ordinances are police power enactments, designed for promotion and perpetuation of people's moral and material welfare, which cities are authorized to enact by Const. art. 11, sec. 11, and St. 1917, p. 1419."

3. "Under Berkeley City Charter (St. 1909, p. 1208 (adopted pursuant to Const. art. 11, sec. 8)) art. 13, sec. 92, and article 14, sec. 93, as amended by St. 1923, p. 1548, legislation on every municipal subject is subject to reference to people for approval or rejection, unless excluded expressly or by clear and necessary implication."

4. "Legislative power of municipality resides in people thereof, who simply withdraw from legislative body and reserve to themselves right to exercise part of their inherent legislative power by enactment of initiative and referendum laws."

It is contended by the defendants that

the legislative body of the city may enact another ordinance with the emergency clause attached. This proposition does not seem to be disputed. However, the emergency clause attached, in order to prevent the qualified electors of the city from filing referendum petitions against the same, must comply with the statute and provisions of the city charter relative to emergency legislation. The authority granted the Legislature by the Constitution to attach the emergency to enactments does not apply to ordinances enacted by the city legislative body. The Constitution provides all that is necessary is for the Legislature to insert an emergency clause in the language provided by the Constitution. Such is not true as to ordinances and resolutions of a municipal Legislature. Section 5889, O. S. 1931, supra, provides, among other things, that:

"* * * No such emergency measure shall become immediately operative unless it shall state, in a separate section, the reasons why it is necessary that it should become immediately operative. * * *"

And such measure must be necessary for the immediate preservation of peace, health, or safety; and this is also required by section 5 of article 5 of the charter of Oklahoma City. The zoning act, chapter 178, supra, authorizes the municipal legislative body to enact ordinances for the purpose of promoting health, safety, morals, or the general welfare of the community, but it does not provide for attaching the emergency clause to an ordinance on the ground that it is necessary to "promote the general welfare," and the emergency may be attached only to ordinances enacted for the immediate preservation of public peace, health, or safety. The query, then, is, Does section 4, which was stricken from Ordinance No. 4475, and which the city council as the legislative body of the city attempted to later annex without readopting the entire ordinance, state facts sufficient to bring it under the statute, section 5889, supra, or the second paragraph of section 5, article 5, of the charter of Oklahoma City? The proposed emergency section is as follows:

"Section 4. (Emergency) Whereas, at the present time great quantities of oil and gas under the properties of the city of Oklahoma City are being drained by many offset wells to the great loss and damage of the said city and the citizens thereof; and, whereas, in order to overcome said condition an emergency exists and it is immediately necessary for the preservation of the public peace, health, safety and welfare of the city of Oklahoma City and the inhabitants thereof; therefore an emergency is hereby declared to exist, by reason whereof this ordinance shall take effect and be in full force and effect from and after its passage."

Section 28 of article 4 of the Constitution of Oregon is as follows:

"No act shall take effect until 90 days from the end of the session at which the same shall have been passed, except in case of emergency; which emergency shall be declared in the preamble or in the body of the law."

By section 1 of article 4 of the Constitution of that state, as amended by the people on June 2, 1902, emergency measures are limited to such laws as are necessary for the immediate preservation of the public peace, health, or safety, and the courts of that state have consistently held that the Legislature of the state is the exclusive judge of the necessity of such measure and has the exclusive right to determine when an emergency exists. The same courts have held otherwise as to city ordinances enacted under laws similar to the provisions of our Code and provisions in city charters similar to the provisions in the charter of Oklahoma City. The city of Astoria, Ore., has a charter provision to the effect that an emergency ordinance may be enacted on the day of its introduction providing it shall contain the statement that an emergency exists and express the reasons constituting such emergency. The Supreme Court of Oregon, in the case of Joplin v. Ten Brook, Mayor, et al., 263 P. 893, says that:

"The question which arises here is whether the ordinance now under consideration constitutes such an emergency within the intent of this provision of the charter. It will be noticed that this provision goes further than the provision in the original Constitution of the state, and requires, not only that an emergency shall have existed, but that the council shall give a reason or reasons for declaring such an emergency. We take it that it was the intent of this section to require something more than a mere declaration that an emergency existed, or that a particular ordinance was necessary to secure the peace, health, or safety of the community, and to require, in addition, the statement of some valid, or apparently valid, reason why such an emergency existed. It may well be, as remarked by the court in Ex parte Hoffman, 155 Cal. 114, 99 P. 517, that: 'The nature of the ordinance itself will, in most instances, be determinative and where a sudden emergency has arisen, a statement of the nature of the urgency finds proper place to support the declaration.'

"We hold in this case, and in all cases where the action of the city council is involved, if upon the face of the ordinance it reasonably appears that an emergency exists, or might seem to a reasonable mind to exist, that a general statement that the immediate effect of the ordinance is necessary for the peace, health, or safety of the community, such declaration will be binding on the courts, even though the courts might differ as to the urgency so declared. But, where it is apparent upon the face of the ordinance that there is no urgent necessity for its passage and going into effect immediately, and it is apparent that the real reason for such declaration of urgency is to avoid the invocation of referendum upon the proposed measure, the court will scrutinize the declaration, and, if no seeming emergency actually exists, it will declare the ordinance ineffective—citing Ex parte Hoffman, supra, and Morgan v. City of Long Beach, 57 Cal. App. 134, 207 P. 53. Such appears to be the drift of opinion wherever the courts have examined the question since the initiative referendum clause has obtained in their various Constitutions."

The court, in the 4th, 5th, 6th, and 7th paragraphs of the syllabus, held:

4. "Where it is apparent on the face of emergency ordinance, enacted under Astoria city charter permitting such ordinances, provided they specify reason constituting emergency, that there is no urgent necessity for its immediate passage and taking effect, but that declaration of urgency is intended to avoid referendum on proposed measure, court will scrutinize the declaration, and declare the ordinance ineffective, if no seeming emergency exists."

5. "Under Astoria city charter, permitting enactment of emergency ordinances, if reason constituting emergency is specified, emergency ordinance, submitting an amendment to the city charter which attempted to shorten time for election or amendment, made changes in procedure, provided penalties for violation, and repealed sections of other ordinances, constituted municipal legislation subject to the referendum, and was void as improper emergency measure, where only reason given for its enactment was that 'the object of this ordinance will be of great benefit to the people of the city of Astoria,' since no legal emergency was stated such as would prohibit referendum."

6. "The mere fact that an ordinance will be of great benefit is not an urgent reason for its going into effect immediately, as every valid law or ordinance is presumed to be passed because of its prospective benefit to community."

7. "Inhabitants of city of Astoria have right, through their charter, to require more explicit statement in ordinance in matter of declaring an emergency than the Constitution requires of the Legislature with regard to emergency measures."

For the reasons above stated, we hold that the emergency clause attempted to be attached to Ordinance No. 4475, as section 4 thereof, failed to state facts sufficient to show that it was necessary in order to preserve the public health, peace, and safety of the city of Oklahoma City that an emergency existed whereby it was necessary that said ordinance take effect and be in full force after its passage and approval, and that an ordinance with an emergency section attached in the form of proposed section 4 to Ordinance No. 4475 may be referred to a vote of the qualified electors in the manner authorized and provided for by statute and the charter of Oklahoma City, Okla.

We have considered all the issues presented, and are of the opinion, and hold, that the plaintiff is clearly entitled to the relief prayed.

The writ of mandamus is, therefore, granted.

RILEY, C. J., and McNEILL, BAYLESS, and WELCH, JJ., concur.