Howard HATFIELD, Jr., and Joseph
L. Flynn, Plaintiffs-Respondents,

v.

Arthur J. MEERS, Mayor of the City of St. Joseph, Mo., Cleo Crouch, Individually and as Chairman of the Housing Authority of St. Joseph, Mrs. Marie Morehead, Mrs. Kelsey Beshears, David Turner and Warren Welsh, Individually and as Members of the Housing Authority of St. Joseph, Housing Authority of St. Joseph, City of St. Joseph, a Municipal Corporation, Its Officers, Agents and Employees, Defendants-Appellants.

No. 24326.

Kansas City Court of Appeals.

Missouri.

April 4, 1966.

---

Richard W. Mason, Jr., City Atty., St. Joseph, for appellants.

Whitney W. Potter, Dale, Potter & Flynn, St. Joseph, for respondents.

SPERRY, Commissioner.

This action in equity was instituted by plaintiffs, who are taxpayers, registered voters, and property owners of the City of St. Joseph, Missouri. They seek to temporarily and permanently enjoin defendants, the City of St. Joseph, a municipal corporation, its Mayor and its officers, agents and employees, and the chairman and members of the Housing Authority of St. Joseph, from taking any action under the provisions of St. Joseph city ordinance No. 17788 which, they alleged, is void. From a judgment holding the ordinance to be null and void, and permanently enjoining defendants from taking any official action pursuant thereto, defendants prosecute this appeal.

The record in this case is quite voluminous, two hundred ninety three pages in transcript, and dozens of documentary exhibits, many of them consisting of several pages. We will endeavor to state the facts in evidence and upon which we will rest our opinion as succinctly as possible under the circumstances.

The ordinance was filed February 17th, 1965. It was first introduced and considered at a meeting of the council, February 23rd. As filed and introduced it did not carry an emergency clause, but after its introduction, it was orally moved that it be passed as an emergency measure, which was done on that date. The wording of the emergency clause was not actually typed into the ordinance until after the meeting adjourned. The ordinance as it appears in the record, is as follows:

"SPECIAL ORDINANCE NO. 17788"

"AN ORDINANCE AUTHORIZING EXECUTION OF A COOPERATION AGREEMENT BETWEEN THE HOUSING AUTHORITY OF ST. JOSEPH, MO., ACTING BY AND THROUGH ITS CHAIRMAN, AND THE CITY OF ST. JOSEPH, MO., A MUNICIPAL CORPORATION, ACTING BY AND THROUGH ITS MAYOR, FOR THE PURPOSE OF COOPERATING IN THOSE MATTERS FOR THE PURPOSE AND ACCORDING TO THE TERMS AND PROVISIONS ALL AS ARE SET FORTH IN SAID AGREEMENT WHICH IS ATTACHED HERETO AND MADE A PART HEREOF AS IF FULLY SET OUT HEREIN, AND *DECLARING THIS ORDINANCE AN EMERGENCY MEASURE*. (The above emphasized words were attached *after* the ordinance left the council chamber).

"WHEREAS, THE COMMON COUNCIL OF THE CITY OF ST. JOSEPH, MISSOURI, AUTHORIZED THE CREATION OF A HOUSING AUTHORITY IN THE CITY OF ST. JOSEPH, MISSOURI, BY THE ADOPTION ON THE 4th DAY OF AUGUST, 1941, OF A RESOLUTION DECLARING THE NEED FOR A HOUSING AUTHORITY TO FUNCTION IN THE CITY OF ST. JOSEPH, MISSOURI:

AND

"WHEREAS, THE MAYOR OF THE CITY OF ST. JOSEPH HAS BY VIRTUE OF HIS OFFICE CAUSED TO BE NAMED AND APPOINTED FIVE DULY QUALIFIED COMMISSIONERS OF THE HOUSING AUTHORITY OF THE CITY OF ST. JOSEPH

IN ACCORDANCE WITH THE 'HOUSING AUTHORITIES LAW',

AND:

"WHEREAS, THE HOUSING AUTHORITY OF THE CITY OF ST. JOSEPH IS A MUNICIPAL CORPORATION AND HAS THE POWER TO ENTER INTO A COOPERATION AGREEMENT WITH THE CITY OF ST. JOSEPH, MISSOURI, BY VIRTUE OF THE POWERS GRANTED IT IN SECTION 99.090, MISSOURI REVISED STATUTES OF 1959, AS AMENDED LAWS OF 1963, AND;

"WHEREAS, THE COUNCIL OF THE CITY OF ST. JOSEPH, MISSOURI, HAS THE POWER TO ENTER INTO A COOPERATION AGREEMENT WITH THE HOUSING AUTHORITY BY VIRTUE OF THE POWERS OF THE COUNCIL AS SET OUT IN SECTION 2.13 OF THE CHARTER OF THE CITY OF ST. JOSEPH; THEREFORE;

"BE IT ORDAINED BY THE COUNCIL OF THE CITY OF ST. JOSEPH, AS FOLLOWS:

"SECTION 1. That the Mayor of the City of St. Joseph, Missouri, be and is hereby authorized to execute and enter into a cooperation agreement between the City of St. Joseph, Missouri, a municipal corporation, and the Housing Authority of the City of St. Joseph, Missouri, for the purpose of cooperating in those matters and for those purposes and according to the terms and provisions all as are set forth in said agreement which is attached hereto and made a part hereof as if fully set out herein.

"SECTION 2. (1) That there exist in the city insanitary or unsafe dwelling accommodations and that persons of low income are forced to reside in such insanitary or unsafe accommodations; that within the city there is a shortage of safe or sanitary dwelling accommodations available at rents which persons of low income can afford and that such persons are forced to occupy overcrowded and congested dwelling accommodations; that the aforesaid conditions cause an increase in and spread of disease and crime and constitute a menace to the health, safety, morals and welfare of the residents of the city and impair economic values; that these conditions necessitate excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety, fire and accident protection, and other public services and facilities; (2) that these areas in the city cannot be cleared, nor can the shortage of safe and sanitary dwellings for persons of low income be relieved, through the operation of private enterprise, and that the construction of housing projects for persons of low income (as here defined) would therefore not be competitive with private enterprise; (3) that the clearance, replanning and reconstruction of the areas in which insanitary or unsafe housing conditions exist and the providing of safe and sanitary dwelling accommodations for persons of low income are public uses and purposes for which public money may be spent and private property acquired and are governmental functions of city concern; (4) that it is in the public interest that work on projects for such purposes be commenced as soon as possible in order to relieve unemployment which now constitutes an emergency; and the necessity in the public interest for the provisions herein enacted, is hereby declared as a matter of legislative determination and therefore, this ordinance is hereby declared an emergency measure, pursuant to Section 2.10, paragraph (1) of the Charter of the City of St. Joseph and shall be in full force and effect immediately upon passage by the Council and approval of the Mayor. * * *".

(Section 2 was typed and added to the ordinance after the council adjourned).

Article II, Section 2.10, Charter of the City of St. Joseph provides, in part, as follows:

## "LEGISLATIVE PROCEEDINGS"

" * * * All bills shall be read by title two times before final passage, *not more than one* of which shall be at the same legislative session; and *at least one week shall elapse between introduction and final passage,* except in the case of an emergency bill".

"An ordinance may be passed as an emergency measure on the day of the introduction of the bill if it contains the statement that an emergency exists and *specifies distinctly* the *facts and reasons* constituting the emergency. No ordinance granting, enlarging, or affecting any franchise shall be passed as an emergency measure. The emergency procedure shall be restricted to the following:

(1) Bills concerning the immediate preservation of public peace, property, health, safety or morals. * * *". (Emphasis ours.)

Article XV of the Charter provides, in part, to the effect that electors of St. Joseph shall have power to approve or reject at the polls all ordinances passed by the council under the provisions of Article II, Section 2.10 of the charter, excepting emergency ordinances enacted under that authority.

Pursuant to the terms of the ordinance the Mayor of St. Joseph, on February 23rd, 1965, entered into a "Cooperation Agreement" with the Housing Authority of St. Joseph. That agreement appears in the transcript. It provides, in part, as follows:

" * * *

"3 (a) Under the constitution and statutes of the State of Missouri, all projects are exempt from all real and personal property taxes and special assessments levied or imposed by any Taxing Body. With respect to any project, so long as either (i) such project is owned by a public body or governmental agency and is used for low-rent housing purposes, or (ii) any contract between the Local Authority and PHA for loans or annual contributions, or both, in connection with such project remains in force and effect, or (iii) any bonds issued in connection with such project or any monies due to the PHA in connection with such project remain unpaid, whichever period is the longest, the Municipality agrees that it will not levy or impose any real or personal property taxes or special assessments upon such project or upon the Local Authority with respect thereto. During such period, the Local Authority shall make annual payments (herein called "Payments in Lieu of Taxes") in lieu of such taxes and special assessments and in payment for the public services and facilities furnished from time to time without other cost or charge for or with respect to such project.

"(b) Each such annual Payment in Lieu of Taxes shall be made after the end of the fiscal year established for such Project, and shall be in an amount equal to either (i) ten percent (10)% of the aggregate Shelter Rent charged by the Local Authority in respect to such Project during such fiscal year, or (ii) the amount permitted to be paid by applicable State law in effect on the date such payment is made, whichever amount is the lower. For the purpose of computing the Federal Annual Contribution and Payment in Lieu of Taxes, all projects which are covered by the same contract with the PHA for annual contributions and which have cooperation agreements subject to limitation as expressed in clause (ii) above, with the identical Taxing Bodies, shall be treated collectively as a single project.

"(c) The Local Authority shall distribute the Payments in Lieu of Taxes among the Taxing bodies in the proportion

which the real property taxes which would have been paid to each Taxing Body for such year if the Project were not exempt from taxation bears to the total real property taxes which would have been paid to all of the Taxing Bodies for such year if the Project were not exempt from taxation; *Provided, however,* That no payment for any year shall be made to any Taxing Body in excess of the amount of the real property taxes which would have been paid to such Taxing Body for such year if the Project were not exempt from taxation.

"(d) *Upon failure of the Local Authority to make any Payment in Lieu of Taxes, no lien against any Project or assets of the Local Authority shall attach,* nor shall any interest or penalties accrue or attach on account thereof. * * *". (Emphasis ours.)

■ Defendants question the qualification of plaintiffs, as taxpayers and citizens, to maintain this action. It is readily apparent, from a reading of the ordinance and the "Cooperation Agreement" entered into by the Mayor, as pleaded, that if the ordinance is valid the city agrees that streets will be declared vacated, new streets and sewers installed, taxes abdicated, liens on property waived, and other concessions made as *required by* another municipal corporation, *not after consideration and action by the council.* Thereby, these plaintiffs will be denied the right to appear and be heard on such matters. The cost of some such installations will be paid out of the city revenues to which plaintiffs and other taxpayers will have contributed. As a result of such additional expenditures, in all probability, additional taxes will necessarily be levied against their property. In order to protect their property rights in this respect they would be required to institute and maintain a multiplicity of legal actions to prevent their property from being subjected to additional taxes based on an illegal ordinance. This is sufficient to vest the court with equitable jurisdiction and to

enjoin enforcement of the ordinance on behalf of plaintiffs and all others similarly situated. Brotherhood of Stationary Engineers et al. v. City of St. Louis, Mo.App., 212 S.W.2d 454, 458; McVey v. Hawkins, 364 Mo. 44, 258 S.W.2d 927 et seq., Paragraph 1. In this case, as in the last cited case, public funds (of the City of St. Joseph) would be unlawfully spent.

This brings us to a consideration of the legality of the emergency clause.

■ It has been held that the affixing of an emergency clause to a statute or ordinance does not, of itself, make it an emergency measure within the meaning of the law. Edmonds v. City of St. Louis, 348 Mo. 1063, 156 S.W.2d 619, 623; State ex rel. Westhues v. Sullivan, 283 Mo. 546, 224 S.W. 327, 334 (en banc). In State ex rel. Pollock v. Becker, 289 Mo. 660, 233 S.W. 641, 646 (en banc), Judge Graves said:

"It is absolutely against all reason to rule that the Legislature can, by chicanery, through a declaration against the very face of the bill, cut the people off from the constitutional right to refer all measures, * * *."

Judge J. T. Blair, in a separate concurring opinion, declared that a legislative act shall not be exempt from the referendum merely because it is declared by the legislature to be "necessary for the *immediate* preservation of the public peace, health, or safety", (emphasis ours), but it depends upon the fact that the act itself is so necessary.

The word "emergency" has been defined as follows: "an unforseen combination of circumstances which calls for *immediate action*", (emphasis ours), Vol. 1. Webster's New International Dictionary, Second Edition, page 837. In Mallon v. Board of Water Commissioners, 144 Mo.App. 104, 128 S.W. 764, 765, Judge Ellison of this court, in discussing the purchase of certain merchandise by a public body, said:

"And the manner of these purchases shows they could not have been an emer-

gency. That word signifies some *sudden* or *unexpected necessity requiring immediate,* or, at least, *quick action,* whereas the meter supplies were obtained without the presence of such a situation. They were known to be in constant demand, and were needed, with approximately correct knowledge in advance in what quantity." (Emphasis ours.)

The Council of the City of St. Joseph, on August 4th, 1941, by its resolution (creating the Housing Authority) solemnly adopted, and declared:

" * * *

2. That insanitary and unsafe inhabited dwelling accommodations exist in said City of St. Joseph, Missouri.

3. That there is a shortage of safe and sanitary dwelling accommodations in said City available to persons of low income rentals they can afford.

4. There is need for a Housing Authority to function in said City of St. Joseph, Missouri; * * *".

Pursuant to that resolution the then Mayor, on August 11th, appointed Commissioners of a Housing Authority. They qualified for their respective positions but we are not cited to any record of activity until, on December 11th, 1964, Mayor Meers appointed the present board, which organized December 16th. No further action of note occurred until the ordinance here involved (except for the emergency features) was filed, on February 17th, 1965. On February 23rd, the ordinance was introduced and enacted as an emergency measure.

We are not concerned with the wisdom of the council in determining that low rental housing was desirable, or necessary in St. Joseph. We are not here concerned with the wisdom of Congress, or of the Legislature, in setting up the machinery that was set up by law so that municipalities could procure Federal aid in obtaining sanitary housing for low income people. We

are, however, concerned with the question of whether the shortage of sanitary housing in St. Joseph, which had existed, according to the records of the council, since 1941, should suddenly create an emergency, twenty-four years later, so as to require enactment of an emergency ordinance to correct the situation, whereby the citizens of St. Joseph would be denied the right of referendum, which is guaranteed to them by the same Charter which defines the powers and duties of the municipal officers, including the Mayor and council.

■ The lack of immediacy and urgency to establish an emergency is shown by the undisputed documentary evidence in this case. There was no oral testimony tending to contradict it. We hold that there existed no emergency, within the meaning of the Charter, so as to justify the enactment of an emergency ordinance.

The final question is whether the trial court, after ruling Special Ordinance No. 17,788 was not an emergency measure, erroneously declared it to be null and void because the council did not comply with the provision of Sec. 2.10, Art. II, of the Charter of the City of St. Joseph governing passage of ordinances other than emergency measures: "All bills shall be read by title two times before final passage, not more than one of which readings shall be at the same legislative session; and at least one week shall elapse between the introduction and final passage, except in the case of an emergency bill." Of course, there was no compliance with this charter provision in this case. The defendants argue that the ordinance was enacted as an emergency measure and there was no need for compliance with the charter provisions governing passage of nonemergency ordinances, even though the ordinance was found to be a nonemergency measure by the trial court and that finding may be affirmed by this court.

To support their theory they cite rulings from our courts and two from courts of other jurisdictions. The rulings of our

courts all dealt wih emergency clauses declaring statutes or ordinances to be effective immediately upon passage so as to avoid the time lapse required before nonemergency measures could become effective. State ex rel. City of Charleston v. Holman, Mo., 355 S.W.2d 946; State ex rel. Pollock v. Becker, 289 Mo. 660, 233 S.W. 641; State ex rel Schmill v. Carr, 239 Mo. App. 939, 203 S.W.2d 670. Questioned only was the validity of emergency clauses. In each instance the courts declared the emergency clause invalid and ruled that the statute or ordinance was not immediately effective but that its effective date was postponed until after the lapse of time required before nonemergency measures could become effective. Significantly no question concerning the effect of failure to comply with conditions precedent to the enactment of valid nonemergency statutes or ordinances was presented by the litigants or ruled by the courts and we assume that those conditions precedent were met. What we have said of these decisions is equally true of State ex rel. Ryers v. Gibson, 183 Or. 120, 191 P.2d 392, relied on by defendants. In Sanborn v. City of Boulder, 74 Colo. 358, 221 P. 1077, on which defendants also rely, a City Council enacted an ordinance with an invalid emergency clause. The court ruled on appeal that the invalidity of the emergency clause did not make the ordinance itself void but simply postponed the time when it should take effect. But before doing so, it carefully determined that all charter requirements necessary to the enactment of the ordinance as a nonemergency measure had been met. This decision militates against defendants' theory.

Numerous decisions from the various jurisdictions exist from which general language can be lifted which says that the invalidity of an emergency clause does not void a statute or ordinance but merely postpones its effective date as a nonemergency measure. Typical are Michelson v. City of Sacramento, 173 Cal. 108, 159 P. 431; Kadderly v. Portland, 44 Or. 118, 74 P. 710, 75 P. 222; Bickel v. Warner-Quinlan Asphalt Co., 70 Okl. 138, 174 P. 537; State ex rel.

Ryers v. Gibson, 183 Or. 120, 191 P.2d 392; Barton v. Recorder's Court of Vale, 60 Or. 273, 119 P. 349; Johnson v. City of Muskogee, 194 Okl. 513, 153 P.2d 118; Whitson v. City of Kingfisher, 176 Okl. 145, 54 P.2d 616; Ex parte Hoffman, 155 Cal. 114, 99 P. 517, 132 Am.St.Rep. 75; McCall v. State ex rel. Daniels, 156 Fla. 437, 23 So.2d 492. Of course, all of these decisions involved the validity of an emergency clause. What has to be remembered always in analyzing them, however, is that they did not involve the question whether a statute or ordinance enacted as an emergency measure with an invalid emergency clause was a valid statute or ordinance, notwithstanding there had been no compliance with requirements essential to validate the measure as a nonemergency statute or ordinance. The logical assumption is that those requirements had been met, else in some of them, at least, we surely would have found the controversy with which we are dealing. Some text books make the same general statement as these decisions, but their citations, except for one we will discuss later, are to decisions of this character only. See 62 C.J.S. Municipal Corporations § 443, p. 857, for one example. Even in Sanborn the court used this same general language: "The decisions in this country, so far as we have examined them, are unanimous that the effect of an invalid emergency clause does not make a statute or ordinance itself void, but simply postpones the time when it shall take effect." This language lifted out of context could be argued in support of defendants' theory with as much force as the decisions on which they rely and which we have discussed. But we repeat, the court carefully scrutinized the record in Sanborn and was satisfied that the ordinance could stand as a nonemergency measure because all the requirements for its validation as such a measure had been complied with by the Council before its passage.

Our research has disclosed that decisions of aid in dealing with the question before us are extremely rare and we have found only four, including Sanborn, that we deem

to be of any value. One is Inland Development Co. v. Oklahoma City, D.C.Okl., 9 F. Supp. 96, relied on by the defendants and cited in some text books. The City Charter authorized enactment of ordinances as emergency measures and set forth what the emergency clause was required to embrace. Three ordinances were passed on the date of their introduction as emergency measures. The emergency clauses were attacked as not declaring true emergencies in compliance with the Charter. On this premise, it was argued that the ordinances were void because they had not "laid over the requisite period of a week before adoption" as required for nonemergency measures. A fair statement is that the court summarily disposed of this important question in three sentences: "It is unnecessary, however, to determine whether the emergency sections of these ordinances are sufficient, although it would appear that at least as to ordinances numbered 3140 and 3831 there is a sufficient statement of the affecting causes to comply with the charter provision. An invalid emergency clause does not make the statute or ordinance itself void, but simply postpones the time when it shall take effect." Disposing precisely of the assertion that the ordinances were not emergency measures and therefore void because they had not "laid over the requisite period of a week before adoption", it said only: "This argument does not seem sound, and is not supported by the authorities." To support its ruling the court cited 43 C.J., p. 542. With a single exception that work cites decisions which bear no relevance to the question the court was then ruling. The exception is Sanborn already discussed. The other decisions it cites are of the class we have cited and explained above. The court's opinion cites only two decisions: State ex rel. Hunzicker v. Pulliam, 168 Okl. 632, 37 P.2d 417, 96 A.L.R. 1294 and Sanborn. The Hunzicker case did not rule or discuss the question the court was then deciding for that question was not presented. 37 P.2d 1. c. 420. We have already analyzed the Sanborn case. It does not support the ruling made and by

analogy it is actually authority to the contrary. We are not persuaded by the Inland Development Co. ruling. It assumed without authority or reasoning that the charter provision before it was only directory and not mandatory. It is grounded on legal authorities that do not support it and it is not sustained by any reason or logic apparent to us. So far as we have discovered it stands alone in ruling as it does.

The California Court of Appeals has dealt with this question twice. In Brown v. Boyd, 33 Cal.App.2d 416, 91 P.2d 926, an ordinance was adopted as an emergency measure authorizing three additional police captains. The City Charter provided that nonemergency ordinances should not be enacted until "after two readings and votes at separate meetings of the board (council), which meetings shall be at least ten days apart." The ordinance was voted upon and adopted by the Council at the first reading. The court ruled that it was not one that could legally be adopted as an emergency measure under governing law and therefore it was void for failure to comply with the requirements essential to validate it as a nonemergency measure. 91 P.2d 1. c. 930.

This question was discussed again in Klassen v. Burton, 110 Cal.App.2d 539, 243 P.2d 28, which dealt with an ordinance adopted as an emergency measure. The emergency clause was declared invalid. On the basis of the Brown case it was argued that the entire ordinance should be declared invalid. The court explained the ruling in Brown as we have summarized it. It examined decisions involving statutory and municipal enactments adopted with an invalid emergency clause. In each decision examined the courts had ruled that the statute or ordinance was valid as a nonemergency measure but that it would not be enforceable until the lapse of time fixed by law caused it to become effective. The court said: "These cases are all distinguishable from Brown v. Boyd, supra, 33 Cal.App.2d 416, 91 P.2d 926, in that in all of them the mechanics of adopting the measures in question were those applicable

to a nonemergency measure, while in the Brown case they were not." It determined that the ordinance before it, although enacted as an emergency one, had been "adopted and published in all respects as required by law" to validate it as a nonemergency measure. In those circumstances it ruled that the invalidity of the emergency clause did not render the ordinance itself void, but only postponed its effective date saying: "So, where a measure is adopted containing an emergency clause which is void, if the adoption of the measure was sufficient to comply with the law as to a nonemergency measure, and the legislative body indicates that it would have adopted the measure without the urgency clause, there is no good reason why the void clause may not be separated from the balance of the measure" and the measure allowed to go into effect in due course.

We believe that the view announced by the California courts in these decisions is the sensible and just one which ought to apply where a City Council enacts as an emergency measure what is in reality a nonemergency measure and in the course of its enactment bypasses some mandatory procedure essential to validate a measure which is not an emergency. For it is easy to imagine the pernicious abuses and consequences that could flow from a different rule.

Our question then is whether Sec. 2.10 of the Charter of St. Joseph requiring all bills to be read by title twice before final passage, with not more than one reading in the same legislative session and providing one week shall elapse between introduction and final passage, except in the case of an emergency bill, is mandatory. If so, Special Ordinance No. 17,788 is void. We deem it necessary to examine the effect of five decisions of our courts which might seem to rule the question here if not carefully analyzed. For example, Aurora Water Co. v. City of Aurora, 129 Mo. 540, 31 S.W. 946, ruled: "Nor does it invalidate that ordinance because, as it is claimed, it was not read three times before its final passage. Section 1597, Rev.St.1889, provides 'No ordinance shall be passed except by bill, and no bill shall become an ordinance, unless on its final passage a majority of the members elect shall vote therefor, and the yeas and nays entered on the journal; and all bills shall be read three times before their final passage.' It is to be observed that the above section does not declare a sentence of nullity against a bill which is not read three times before its final passage. Such declaration is altogether confined to the preceding clauses of the section, and does not apply to the last clause." For the reason advanced by the court, its ruling was that the requirement for three readings of all bills was directory and not mandatory. City of Rockville v. Merchant, 60 Mo.App. 365, dealt with the same statute quoted and ruled on in Aurora and reached the same result. Hook v. Bowden, 144 Mo.App. 331, 128 S.W. 261, dealt with a statute in all legal respects identical with the statute ruled on in Aurora and City of Rockville and reached the same result. Sec. 5955, R.S.Mo.1899. State ex rel. Attorney General v. Mead, 71 Mo. 266 construed a constitutional provision. Barber Asphalt Paving Co. v. Hunt, 100 Mo. 22, 13 S.W. 98, 8 L.R.A. 110, construed a charter provision. The provisions construed in these two cases were identical in all relevant legal respects with those in Aurora, City of Rockville and Hook and the rulings made were the same and on the same reasoning.

We can easily understand the reasoning of the Supreme Court and the Courts of Appeals that the language of the clauses of the statutory, charter, and constitutional provisions preceding the requirement for reading ordinances and bills was mandatory for that language clearly constituted a firm mandate to enact no ordinance or bill without first complying with the requirements it prescribed. It was grammatically and structurally separate from the requirement for reading ordinances and bills and plainly inapplicable to that requirement. Once this conclusion was reached, and it was the

reasoning of the courts, it certainly could be argued with logic that the requirement for reading bills was not mandatory but directory.

On the other hand, we do not believe that these decisions govern in this controversy. It must be borne in mind in considering them that not one of them states or implies that no statutory or charter provision requiring delay and successive readings of ordinances before passage can ever be mandatory. Nor do they state or imply that no such provision requiring delay and successive readings can ever be mandatory unless it expressly declares "a sentence of nullity" for failure to comply. Indeed, there is no ironclad rule that laws to be mandatory must expressly declare "a sentence of nullity" for failure to comply. Our Supreme Court has ruled that employment in a statute of the word "shall", as does the provision of the charter under scrutiny, is mandatory where "public interests and rights are concerned." State ex rel. Consolidated School Dist. No. 9 v. Lee, 303 Mo. 641, 262 S.W. 344. Certainly public interests and rights are concerned in this controversy.

■ A familiar and indisputable rule in the interpretation of statutory or charter provisions is that the interpreter must analyze all of its parts in context and not separately isolate them piece by piece. To do so could prevent each part from breathing strength or weakness or difference of meaning into the other parts and leave each part in its own separate desert, likely with a meaning never intended by the framers of the provision. We examine Sec. 2.10 of the charter in this light. There is absolutely no language in Sec. 2.10 preceding the requirement for two successive readings of the title of nonemergency bills at different legislative sessions with the lapse of a week between introduction and final passage which weakens its force and effect or qualifies it in any way. The total absence of any such preceding language distinguishes this requirement from the statutory, charter and constitutional provisions construed by the Supreme Court and the Courts of Appeals in the decisions we have just discussed. The final clause of this requirement, "except in the case of an emergency bill", operates not alone to exempt such bills from its application. It serves also to strengthen the force of this requirement as to all other bills by being written into it as the sole exception to it. There is absolutely no language following this requirement which tends to weaken its force and effect. On the contrary, there is much that shows that those who wrote it did not intend it to be obeyed or disobeyed at will by the Council and there is nothing that suggests that it can be evaded by merely attaching a baseless emergency clause to a nonemergency measure.

Notice the provisions that follow the requirement for successive readings of the title of all nonemergency bills at different legislative sessions with a week elapsing between introduction and final passage: (1) Every bill introduced *shall* be filed with the City Clerk on or prior to the day of its first reading and *shall* remain on file in his office for public inspection until it is finally adopted or fails of passage; (2) *Prior to the passage of any bill,* other than an emergency bill, all persons interested therein *shall* be given an opportunity to be heard before the Council; (3) *After the second reading of any bill and compliance with the other provisions of Sec. 2.10,* the Council *may* finally pass the bill with or without amendment; (4) If the Council makes an amendment which constitutes a change in substance, the bill as amended *shall* be filed in the office of the City Clerk for one additional week *and* an opportunity afforded for a further public hearing after which final action *may be* taken thereon.

The requirement for delay and successive readings of all nonemergency bills by title, etc., and the provisions just noted which follow this requirement, obviously were designed to afford the members of the Council and the public an opportunity to acquaint themselves with the effect and terms of all such bills and to safeguard against

error, injustice and hasty or ill-advised action by the Council. These provisions are the clearest recognition of the duty of the Council to act on nonemergency bills only after deliberation and of the right of all members of the public to know, to understand and to protest if they desire. Common knowledge is that the exercise of this right oftentimes prevents enactment of ordinances not in the public interest. To say that those who wrote into Sec. 2.10 these strong and unequivocal safeguards for the restraint of the Council and the protection of the public did so with the intent that the Council could obey or disobey them at will or evade them by means of a baseless emergency clause, is to adjudge that a fraud has been perpetrated on the public of St. Joseph. For we believe that any voter examining these provisions of the charter before voting at an election for its approval or disapproval would believe they were meant to be obeyed and that he would have every right to do so.

We have discovered no decision of our own appellate courts declaring or persuading that we must construe the requirement for successive readings of the title of all nonemergency bills on different days, with a week elapsing between their introduction and final passage, as merely directory and not mandatory. We are convinced that this requirement is mandatory and we so hold. In so ruling we are supported by the solid weight of authority on this subject in this country. "It may be laid down as a general rule, that all charter or statutory requirements as to the method in which an ordinance shall be introduced, and the manner in which it shall be considered, are, when reasonably calculated to induce deliberation, mandatory in their nature, and must be complied with. Among statutory requirements of this nature are provisions that all ordinances shall be read three times before their final passage, and that no ordinance shall pass at the same meeting at which it is introduced. These provisions are mandatory, and an ordinance which is passed without complying with

them is void." Dillon, Municipal Corporations, Fifth Ed., Sec. 576, p. 905. See texts to the same effect: McQuillin, Municipal Corporations, 3rd Ed., Vol. 4, Sec. 1346, p. 534; 62 C.J.S. Municipal Corporations § 418, p. 801; 37 Am.Jur., Municipal Corporations, Sec. 144, p. 756; Antieau Municipal Corporation Law, Vol. 1, Sec. 4.06, page 193; Yokley, Municipal Corporations, Vol. 1, Sec. 83, p. 212; and Town of Danville v. Shelton, et al., 76 Va. 325; Swindell v. State ex rel. Maxey, 143 Ind. 153, 42 N.E. 528, 35 L.R.A. 50; Horner v. Rowley, 51 Iowa 620, 2 N.W. 436; Newbold v. City of Stuttgart, 145 Ark. 544, 224 S.W. 993; Wilder v. American Produce Co., Tex.Civ.App., 147 S.W.2d 936; Cisco v. City of Ashland, 218 Ky. 52, 290 S.W. 1032; Brumley v. Town of Greeneville, 38 Tenn.App. 322, 274 S.W.2d 12; Hukle v. City of Huntington, 134 W.Va. 249, 58 S.E.2d 780; Thompson v. Wingard, 250 Ala. 390, 34 So.2d 606; In re Lancaster City Ordinance No. 55–1952, 383 Pa. 471, 119 A.2d 307; City of Hazard v. Collins, 304 Ky. 379, 200 S.W.2d 933; Paterson & Ramapo R. Co. v. Mayor, etc., City of Paterson, 74 N.J.L. 738, 68 A. 76; State, Ackerman, Pros. v. Town of Bergen, 33 N.J.L. 39; Bill Posting Sign Co. v. Atlantic City, 71 N.J.L. 72, 58 A. 342; Tennent v. City of Seattle, 83 Wash. 108, 145 P. 83; Costakis v. Village of Yorkville, 109 Ohio St. 184, 142 N.E. 30; Village of Vinton v. James, 108 Ohio St. 220, 140 N.E. 909.

Since the Council failed to comply with the mandatory requirement of Sec. 2.10 of the Charter for delay and successive readings in enacting Special Ordinance No. 17,-788, we rule that it is void.

The judgment is affirmed.

MAUGHMER, C., concurs.

PER CURIAM.

The foregoing opinion of SPERRY, C., is adopted as the opinion of the Court. All concur.